*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VHS OF MICHIGAN, INC., doing business as
DETROIT MEDICAL CENTER,

        Plaintiff-Appellee,

and

ESTATE OF DR, a legally incapacitated person, by
Conservator SUSAN ATKINSON-FIDEL,

        Intervening Plaintiff-Appellee,

v

USA UNDERWRITERS,

        Defendant-Appellant,

and

FARMERS INSURANCE EXCHANGE,

        Defendant-Appellee.

UNPUBLISHED
September 30, 2025
1:12 PM

No. 369637
Wayne Circuit Court
LC No. 22-001459-NF

Before: LETICA, P.J., and RICK and BAZZI, JJ.

PER CURIAM.

In this no-fault insurance action, defendant, USA Underwriters (USA), appeals by leave granted[1] the trial court's order denying USA's motion for summary disposition and granting summary disposition in favor of plaintiff, VHS of Michigan, Inc., doing business as Detroit

---

[1] *VHS of Mich, Inc v USA Underwriters*, unpublished order of the Court of Appeals, entered April 19, 2024 (Docket No. 369637).

Medical Center (plaintiff), and defendant Farmers Insurance Exchange (Farmers).[2]  We reverse and remand for further proceedings.

## I.  BASIC FACTS AND PROCEDURAL HISTORY

This appeal arises from an automobile insurance policy purchased by Susan Marie Atkinson-Fidel (Fidel) and the catastrophic injuries that Fidel's adult son, DR, later sustained when he was struck by a vehicle.

At all times relevant to this appeal, Fidel lived in a two-bedroom house in Detroit, Michigan.  In March 2021, Fidel applied for and purchased a no-fault insurance policy from LA Insurance Agency 43, LLC (LA Insurance), which policy was underwritten by USA.  Fidel did not list any other household members in her application, nor did Fidel's insurance policy identify any relatives that lived in her household.  Although DR stayed overnight at Fidel's house with some frequency in the preceding months, Fidel did not equate those visits to him living with her, and she did not tell anyone at LA Insurance that he lived in her house.  The same day Fidel purchased the insurance policy, Fidel executed a form indicating that she elected not to maintain personal protection insurance (PIP) coverage for allowable-expense benefits.  Fidel made this choice in exchange for a lower policy premium.  As part of this choice, Fidel certified, in relevant part, that any resident relative of Fidel had qualified health coverage or had applicable coverage under a different insurance policy.

In June 2021, a vehicle hit DR while he was riding an electric scooter.  DR sustained substantial injuries that required significant medical intervention and treatment.  Someone filed a claim for PIP benefits with USA on DR's behalf shortly after the accident, but this claim was denied on the basis that Fidel had elected not to maintain coverage for allowable-expense benefits in her insurance policy.  Thereafter, Fidel (on DR's behalf) and plaintiff each submitted applications for PIP benefits with the Michigan Assigned Claims Plan (MACP).

Plaintiff initiated this case by filing a complaint setting forth a no-fault claim against Farmers, the insurance carrier assigned to DR's claim by the MACP, under the no-fault act, MCL 500.3101 *et. seq.*  In relevant part, plaintiff sought reimbursement for over $2 million in medical services and treatment plaintiff allegedly provided DR after the accident.  Farmers denied responsibility for the payment of allowable-expense benefits related to DR's injuries and argued that, at the time of the accident, DR resided with a relative who had an active no-fault insurance policy—Fidel.  After plaintiff unsuccessfully sought reimbursement from USA, plaintiff amended its complaint to add USA as a defendant.  In the amended complaint, plaintiff brought no-fault claims against both USA and Farmers and sought declaratory relief regarding which insurance carrier was responsible for the payment of DR's PIP benefits and whether Fidel made an

---

[2] There were four parties to this action below: (1) plaintiff, (2) intervening plaintiff, Susan Atkinson-Fidel (Fidel), as conservator for DR, a legally incapacitated person, (3) defendant, USA, and (4) defendant, Farmers.  For purposes of this opinion, we will refer to Farmers and USA, collectively, as defendants.  When referencing Fidel and DR in their individual capacities, we will refer to them as Fidel and DR, respectively.

ineffective election in her insurance policy such that USA was liable for the payment of unlimited allowable-expense benefits. USA and Farmers each answered the amended complaint and denied being the highest-priority insurer.

Intervening plaintiff, Fidel, as conservator for the estate of DR, a legally incapacitated person, then intervened in the case and brought first-party benefit claims against Farmers and USA. Again, USA and Farmers each denied responsibility for the payment of no-fault benefits relative to DR. After the parties conducted discovery, USA, plaintiff, and Farmers each filed competing motions for summary disposition under MCR 2.116(C)(10). Relevant to the present appeal, the motions raised arguments regarding (1) whether DR was domiciled in Fidel's household at the time of the accident, such that Fidel's insurance policy was applicable to DR and (2) whether Fidel made an effective election to opt out of allowable-expense benefits under MCL 500.3107d(1). After holding a hearing on the competing motions, the trial court denied USA's motion for summary disposition and granted summary disposition in favor of plaintiff and Farmers. In an order entered after the hearing, the trial court ruled that DR was domiciled with Fidel on the date of the accident, Fidel's insurance policy applied to the injuries DR sustained in the accident, and Fidel did not make an effective election under MCL 500.3107d(1). This appeal followed.

## II. STANDARD OF REVIEW

The appellate court reviews "de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A motion for summary disposition submitted pursuant to MCR 2.116(C)(10) tests the factual sufficiency of a claim." *Wilmore-Moody v Zakir*, 511 Mich 76, 82; 999 NW2d 1 (2023). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil*, 504 Mich at 160. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Gueye v State Farm Mut Auto Ins Co*, 343 Mich App 473, 481; 997 NW2d 307 (2022) (quotation marks and citation omitted).

"The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)." *Barnes v 21st Century Premier Ins Co*, 334 Mich App 531, 540; 965 NW2d 121 (2020) (quotation marks and citation omitted). "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Id*. at 541.

## III. DOMICILE UNDER THE NO-FAULT ACT

On appeal, USA argues that the trial court erred by determining DR's domicile as a matter of law. We agree.

MCL 500.3114(1) sets forth "the general rule for determining which Michigan insurer is liable to provide PIP benefits." *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 490; 835 NW2d 363 (2013). Under MCL 500.3114(1), subject to certain exceptions, a PIP insurance policy

"applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either *domiciled in the same household*, if the injury arises from a motor vehicle accident." MCL 500.3114(1) (emphasis added). On appeal, the parties dispute whether DR was domiciled at Fidel's house at the time of DR's accident, such that Fidel's insurance policy applied to DR.

Although "the no-fault act does not define the term 'domiciled,' " *Grange*, 494 Mich at 492, our Supreme Court has explained that the common-law meaning should be used for purposes of the no-fault act, *id*. at 492-493. Accordingly, the term "domicile" means "the place where a person has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Id*. at 493 (quotation marks and citation omitted). A "domicile" is "acquired by the combination of residence and the intention to reside in a given place. . . ." *Id*. at 495 (quotation marks and citation omitted; omission in original). "If the intention of permanently residing in a place exists, a residence in pursuance of that intention, however short, will establish a domicile." *Id*. (quotation marks and citation omitted). "The traditional common-law inquiry into a person's 'domicile,' then, is generally a question of intent, but also considers all the facts and circumstances taken together." *Id*. Notably, "a person can only have a single domicile at any given point in time." *Id*. at 494.

Our Supreme Court has recognized that, when analyzing whether a person is domiciled in the same household as an insured for purposes of MCL 500.3114(1), Michigan courts evaluate the following factors adopted from *Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477, 495-497; 274 NW2d 373 (1979):

> (1) the subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his "domicile" or "household"; (2) the formality or informality of the relationship between the person and the members of the household; (3) whether the place where the person lives is in the same house, within the same curtilage or upon the same premises, (4) the existence of another place of lodging by the person alleging "residence" or "domicile" in the household. . . . [*Grange*, 494 Mich at 497 (quotation marks and citation omitted; omission in original).]

The *Workman* factors constitute a "flexible multi-factor test," and "no one factor is determinative." *Id*. at 497. Moreover, the *Workman* factors "do not make a comprehensive and exclusive list; they are merely [a]mong the relevant factors to be considered." *Cervantes v Farm Bureau Gen Ins Co of Mich*, 272 Mich App 410, 415; 726 NW2d 73 (2006) (quotation marks and citation omitted; alteration in original).

Michigan courts also evaluate the following additional factors, adopted from *Dairyland Ins Co v Auto Owners Ins Co*, 123 Mich App 675, 682; 333 NW2d 322 (1983),[3] which focus, in particular, on adult children of an insured individual:

> [1] whether the claimant continues to use his parents' home as his mailing address, [2] whether he maintains some possessions with his parents, [3] whether he uses his parents' address on his driver's license or other documents, [4] whether a room is maintained for the claimant at the parents' home, and [5] whether the claimant is dependent upon the parents for support. [*Grange*, 494 Mich at 497 n 41 (quotation marks and citation omitted; alterations in original).]

"The *Workman-Dairyland* multifactored framework comprises the one now commonly employed by Michigan courts when a question of fact exists as to where a person is domiciled." *Grange*, 494 Mich at 497 n 41.

In this case, the trial court found, as a matter of law, that DR was domiciled at Fidel's home at the time of the accident. In coming to this conclusion, the trial court stated its belief that the facts surrounding DR's domicile were not in dispute and briefly referenced a few of the *Dairyland* factors. However, a full application of the *Workman-Dairyland* factors to the present case demonstrates that there was conflicting evidence, material to the determination of DR's domicile, that rendered summary disposition inappropriate. *Barnes*, 334 Mich App at 540.[4]

Beginning with a consideration of the *Workman* factors, there is no dispute that DR lived on the same premises as Fidel when he stayed at her house. Additionally, the record arguably contains evidence that DR intended to remain at Fidel's house for an unlimited period of time. In the months preceding the accident, DR stayed with Fidel, Hope Omase Jones (Jones), who was DR's girlfriend with whom he shared a child, and Robert Marsh (Marsh), who was DR's uncle. However, DR testified that he did not intend to live with Marsh, and, although DR planned to move in with Jones at some point in the future, he did not plan to live with her in the apartment Jones leased at the time of the accident. DR further testified that he considered Fidel's house his "main address" and his "ultimate home" that he "returned to at night." Although Fidel did not contemplate that DR lived with her in the months preceding the accident, she also testified that she

---

[3] "Although published decisions of this Court issued prior to November 1, 1990, are not strictly binding on this Court, all published decisions of this Court are precedential under the rule of stare decisis and generally should be followed." *Davis v Secretary of State*, 346 Mich App 445, 462 n 10; 12 NW3d 653 (2023).

[4] We note that the issue of whether DR was domiciled in Fidel's household at the time of the accident, such that Fidel's insurance policy was applicable to DR under MCL 500.3114(1), was raised in relation to each of the competing motions for summary disposition. We acknowledge that our obligation to make all legitimate inferences in favor of the nonmoving party, *Anderson*, 341 Mich App at 507, means that different inferences could potentially be drawn from the evidence relative to each respective motion. However, considering the amount of conflicting or unclear evidence in this case, we opine that summary disposition was inappropriate regardless of whether a certain inference favors USA, plaintiff, or Farmers in a particular instance.

did not know whether there was any location, other than her own house, that would have served as DR's permanent home at the time of the accident. Considering the foregoing, the record arguably indicates that DR intended to live with Fidel for an unlimited period of time, at least until he obtained new, separate housing with Jones.

However, there is contradictory evidence regarding whether DR had other places of lodging at the time of the accident. For example, Jones testified that DR only stayed with Fidel between January 2021, and the time of the accident in June 2021. DR, Fidel, and Jones all also testified that DR spent several nights each week staying somewhere other than Fidel's house during that time. More specifically, in the months preceding the accident, DR stayed with at least three different people each week: Fidel, Jones, and Marsh. DR provided inconsistent testimony regarding whether he also occasionally stayed with an unnamed brother during that period. Additionally, although Jones testified that DR did not move into her apartment before the accident and did not financially contribute to the payment of rent or utilities, Jones acknowledged that DR occasionally gave her money, went grocery shopping for her, and helped "take care of things" like "a regular household." Similarly, although DR testified that he did not necessarily pay for rent or utilities at Jones's apartment, DR also testified that he gave Jones approximately $150 each month "for staying the couple of nights [he] did stay" there. DR affirmed that this money was not only intended "for rent," but also for "food for the household," "toys," and "whatever [Jones] wanted to use it on . . . ."

Moreover, DR acknowledged that the frequency with which he stayed with Fidel, Jones, and Marsh fluctuated throughout 2021, and the record contains contradictory evidence regarding how often DR stayed with each person. DR estimated that, in the six months preceding the accident, he generally stayed at Jones's apartment two or three weekdays each week; Marsh's apartment "[m]aybe once or twice" each week; and at Fidel's home the remaining days of the week. Although DR affirmed that it would be fair to say he spent "the majority of the nights in any given week" at Fidel's house, DR also testified that he began staying at Jones's apartment three or four times each week during the same timeframe. Jones testified that DR stayed at her apartment two or three days per week during that time. Fidel similarly provided inconsistent testimony regarding how often DR stayed with her. More specifically, Fidel testified that, around the time she obtained the insurance policy, Fidel did not live with any of her children, including DR; DR "kind of" lived with her but was "in and out;" DR occasionally stayed the night at Fidel's house, though Fidel did not know how many days per week he did so; Fidel was unsure whether DR stayed at her house overnight; DR "[p]robably" stayed overnight at her house "a couple times out of the week, maybe;" and there were times Fidel did not see DR for weeks at a time. More generally, Fidel testified that she did not view DR as living at her house because, although he was always welcome there, he spent most of his time elsewhere.

The record also indicates that DR had an informal relationship with Fidel. DR testified that he did not pay Fidel any rent to stay at her house. Although Fidel testified that she, at some unspecified time, told her landlord that DR was living with her, there is no evidence in the record that DR was listed on Fidel's lease, nor that DR and Fidel had any formal arrangement regarding DR staying at Fidel's home. Additionally, although Fidel described her home as DR's home, Fidel also affirmed that this was a "sentiment" she held for all of her adult children, by which she meant that her home was their home and they were "welcome to come and go . . . ." Notably, the record contains contradictory evidence regarding how DR accessed Fidel's home. Fidel testified that DR

-6-

had a key at the time of the accident, and DR was welcome to enter her house whenever he wanted to do so. DR, however, testified that he did not have a key to Fidel's house before the accident, he usually gave Fidel a "heads-up" before he went to her house, and Fidel unlocked the door for him. Fidel also testified that her other adult sons had keys to Fidel's house despite the fact that they each moved to Las Vegas six years previously.

Turning to the *Dairyland* factors, the record indicates that DR only kept his possessions at Fidel's house before the accident, which favors a finding that DR was domiciled at Fidel's house. The application of the remaining *Dairyland* factors to the specific circumstances of this case, however, is less clear. For example, DR, Fidel, and Jones all testified that DR received all of his mail at Fidel's house before the accident. But, under the specific circumstances of this case, it is unclear whether DR's decision to receive his mail at Fidel's house truly indicated that her house was his domicile. For example, DR continued to receive his mail at Fidel's house at the time of his deposition in June 2023, despite the fact that he permanently moved out of Fidel's house in February 2022. Additionally, DR testified that he "usually" used Fidel's address for his "mailing" because it gave DR "time to stop by, check on [Fidel], and pick up [his] mail and stuff." Moreover, Fidel testified that her other adult sons continued to receive mail at her house six years after they both moved to Las Vegas. Similarly, DR used Fidel's address on his driver's license, and other documents, such as DR's W-2s and Bridge Card application. DR also believed that he used Fidel's address when he registered to vote. Again, there is a question regarding how demonstrative this evidence is regarding DR's domicile. For example, DR continued to use Fidel's address on his driver's license at the time of DR's deposition in June 2023, despite the fact that DR permanently moved out of Fidel's house in February 2022.

Additionally, the record contains contradictory evidence regarding whether Fidel actually maintained a room in her home specifically for DR. Fidel and DR both testified that DR had his own bedroom at Fidel's house before the accident, which DR described as "pretty bare." Although Fidel testified that neither of her other two adult sons had their own bedrooms in her home, she also testified that they were welcome to stay at her home, and that she had "an extra bedroom if they need . . . ." Fidel did not elaborate regarding what she considered an "extra" bedroom, and there was no temporal limitation to this statement. Considering Fidel's house contained only two bedrooms, it is unclear whether the room in which DR stayed at Fidel's house in the months preceding the accident was considered DR's room, specifically, or merely an extra room in which any of Fidel's children could stay, when necessary. Finally, the record does not contain any evidence indicating that Fidel supported DR, financially or otherwise.

In light of the foregoing, summary disposition under MCR 2.116(C)(10) was inappropriate relative to the issue of whether DR was domiciled in Fidel's household at the time of the accident. *Barnes*, 334 Mich App at 540 ("The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10).") (Quotation marks and citation omitted.). Considering that Fidel's insurance policy only applies to DR if DR was, in fact, domiciled in her household at the time of the accident, the trial court therefore also erred by determining, as a matter of law, that Fidel's insurance policy applied to the injuries DR sustained in the accident. Finally, the trial court's determination of whether Fidel made an effective election under MCL 500.3107d(1) was premature because that determination is only relevant in the event Fidel's insurance policy applied to DR at the time of the accident. Similarly, the trial court erred

in the rationale employed in denying USA's motion for summary disposition and by granting summary disposition in favor of Farmers and plaintiff on these grounds.[5]

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Michelle M. Rick
/s/ Mariam S. Bazzi

---

[5] In light of these conclusions, we need not and do not consider USA's remaining argument on appeal.